

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00670-CV

———————————————

SIDDHARTHA RATH, MD AND DURGA MEKALA, MD, Appellants

V.

DORI SEIMET, Appellee

---

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-363890-25

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

**MEMORANDUM OPINION**

In this interlocutory appeal, Appellants Siddhartha Rath, MD and Durga Mekala, MD, appeal the trial court's denial of their motion to dismiss the healthcare-liability claims brought against them by Appellee Dori Seimet.[1] *See* Tex. Civ. Prac. & Rem. Code § 74.351; *see also id.* § 51.014(a)(9). Appellants argue that Seimet failed to file an adequate medical expert report as required by statute. We will affirm.

## I. BACKGROUND

This appeal proceeds from ongoing healthcare-liability claims. In October 2020, Seimet underwent an attempted robotic abdominal hysterectomy and suffered perforation of her colon. The perforation was not recognized at the time of the surgery, and Seimet was discharged but later required additional surgery. After corrective surgeries and complications arising from them, Seimet developed a large ventral hernia.[2] Seimet's family physician referred her to Rath, a surgeon.

In May 2023, Rath analyzed the hernia, noted Seimet's other existing health conditions, and performed surgery on July 11, 2023 to repair the hernia and to implant

---

[1]Carla Bashwiner, as representative of the estate of Dori Seimet, pursued the underlying litigation and pursues this appeal. References to Seimet herein are to the estate.

[2]Seimet's suit as originally filed alleged torts related to these earlier surgeries against other defendants who are not parties to this appeal. In February 2025, the trial court severed several defendants from this suit, leaving only Appellants and one other defendant who is also not a party to this appeal.

surgical mesh. Rath delegated Seimet's post-surgical care to Mekala.[3] Three days after surgery, Mekala released Seimet to her home with instructions to follow up with Rath for additional care. Two days after she was released from the hospital, Seimet died.

In November 2024, Seimet filed her healthcare-liability claims against Appellants, who answered in December 2024. In April 2025—within 120 days of Appellants' answers—Seimet served Appellants with an expert report prepared by Dr. Carl Adams, a board certified cardiovascular and thoracic surgeon, trauma surgeon, and acute surgical critical care specialist licensed and practicing in California, and elsewhere, since at least 1987. On May 5, 2025—within 21 days of receiving the report—Appellants objected to that report and moved to dismiss Seimet's claims. *See id.* § 74.351(a). The trial court granted Seimet a 30-day extension to cure deficiencies in the report.[4] *See id.* § 74.351(c).

Seimet timely filed an amended report from Dr. Adams, adding to the analysis of Seimet's medical complications, the applicable medical standards, Appellants' alleged breaches of those standards, and how those breaches caused Seimet harm. After the

---

[3]Dr. Adams's report does not address Mekala's title, although Appellants argue and Appellee concedes that he is a "hospitalist physician."

[4]The trial court's order does not specify the deficiencies of the initial report, other than noting that the extension is to cure "the deficiencies set forth in Defendants' objections."

trial court denied their second motion to dismiss alleging a statutorily deficient expert report, Appellants filed this interlocutory appeal.

## II.     ADEQUACY OF THE REPORT

Appellants' first three issues[5] all share the same theme: they argue that the amended expert report is inadequate. Appellants argue the issues collectively, and thus will we address them. Appellants argue that Dr. Adams was not qualified to opine on their standards of care and that the amended report failed to adequately address either the standard of care or causation.

### A.     Standard of Review and Applicable Law

Chapter 74 of the Texas Civil Practice and Remedies Code (the Act) requires healthcare-liability claimants to serve one or more expert reports upon each defendant not later than 120 days after that defendant's answer is filed. Tex. Civ. Prac. & Rem. Code § 74.351(a). An expert report is sufficient under the Act if it provides a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered failed to meet the standards, and the causal relationship between the alleged failure and the alleged injury. *Id.* § 74.351(r)(6); *Bush v. Columbia Med. Ctr. of Arlington Subsidiary, L.P.,* 714 S.W.3d 536, 543 (Tex. 2025); *Staats v. Singley*, No. 02-24-00501-CV, 2025 WL 3301061, at *2 (Tex. App.—Fort Worth, Nov. 26, 2025, no pet.) (mem. op.). The trial court need only find that the report constitutes a

---

[5]Appellants raise four issues in total. The fourth is addressed below.

4

"good faith effort" to comply with the Act's requirements. Tex. Civ. Prac. & Rem. Code § 74.351(l); *Bush*, 714 S.W.3d at 543; *Staats*, 2025 WL 3301061, at \*2. A trial court must dismiss a plaintiff's claims for failure to file a sufficient expert report only if the report does not represent a good-faith effort to comply with the statutory definition of an expert report. *See* Tex. Civ. Prac. & Rem. Code § 74.351(l); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

An expert report demonstrates a good faith effort when it "(1) informs the defendant of the specific conduct called into question and (2) provides a basis for the trial court to conclude the claims have merit." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam) (cleaned up) (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A report need not marshal all the claimant's proof, but a report that merely states the expert's conclusions about the standard of care, breach, and causation is insufficient. *Id.*

The "good faith effort" test is a "low threshold" "to weed out frivolous malpractice claims," not to adjudicate potentially meritorious claims. *Bush*, 714 S.W.3d at 543 (quoting *Abshire*, 563 S.W.3d at 223); *Staats*, 2025 WL 3301061, at \*2. A report "adequately addresses causation when the expert explains 'how and why' breach of the standard caused the injury in question by 'explain[ing] the basis of his statements and link[ing] conclusions to specific facts.'" *Bush*, 714 S.W.3d at 544 (quoting *E.D. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (alterations in original)). In this regard, the court's role with respect to causation

5

is to determine whether the expert has explained how the negligent conduct caused the injury, not whether the expert has proved causation. *Abshire,* 563 S.W.3d at 226 . . . . The "fair summary" threshold "is not an evidentiary standard, and at this early stage of the litigation, 'we do not require a claimant to present evidence in the report as if it were actually litigating the merits'." *E.D.,* 644 S.W.3d at 667. Instead, "[t]he ultimate evidentiary value of the opinions proffered"—that is, whether there actually is a causal connection—"is a matter to be determined at summary judgment and beyond." *Id.* For this reason, an "adequate" expert report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Miller v. JSC Lake Highlands Operations, LP,* 536 S.W.3d 510, 517 (Tex. 2017) (quoting *Palacios,* 46 S.W.3d at 879).

*Id.* (citation modified and emphases altered).

As we summarized in *Staats,*

[i]n short, to satisfy the causation requirement, "the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire,* 563 S.W.3d at 224 (emphasis added) (quoting *Columbia Valley Healthcare Sys., L.P. v. Zamarripa,* 526 S.W.3d 453, 460 (Tex. 2017)). It is sufficient for the report to draw a direct line from the negligent conduct to a delay in diagnosis and proper treatment, to the ultimate injury. *Id.* at 225.

2025 WL 3301061, at *2.

We review the denial of a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Abshire,* 563 S.W.3d at 223. In analyzing a report's sufficiency, we consider only the information contained within the four corners of the report and attached curriculum vitae, if any. *Id.* A reviewing court may not fill gaps in a report by drawing inferences or guessing as to what the expert meant or intended. *Moore v. Gatica,* 269 S.W.3d 134, 140 (Tex. App.—Fort Worth 2008, pet. denied).

6

**B.     Discussion**

   **1.      Dr. Adams was qualified to render the expert report as to the standard of care.**

In their third issue, Appellants argue that Seimet "did not show that Dr. Adams is qualified as to Dr. Mekala." We disagree.

Under Section 74.351, an expert who gives opinion testimony as to a physician's proper standard of medical care must be qualified under Section 74.401. Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(A). A person may qualify under that section as an expert witness on the issue of whether a physician departed from accepted standards of medical care only if the person is a physician who (1) is practicing medicine at the time the testimony is given or was practicing medicine at the time the claim arose, (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *Id.* § 74.401(a); *see Hamon v. Jimenez*, No. 12-25-00038-CV, 2025 WL 1403684, at *8 (Tex. App—Tyler May 14, 2025, no pet.) (mem. op.) (finding hospitalist to be qualified to address the standards of care of surgeon in a post-operative patient where the standards of postoperative care were the same for both specialties).

First, for purposes of Section 74.401, "practicing medicine" includes, but is not limited to, serving as a consulting physician to other physicians who provide direct patient care, upon request of other such physicians. Tex. Civ. Prac. & Rem. Code

§ 74.401(b). As described in his curriculum vitae attached to the report, Dr. Adams had been licensed to practice medicine since at least 1987 and was an "Attending Consultant/Surgeon in Cardiovascular and Thoracic Surgery" at St. Joseph-Providence Stanford Health-Care Hospital in Eureka, California at the relevant times and was credentialed to treat postoperative patients by his current hospital. *See El Paso Specialty Hosp. Ltd. v. Gurrola*, 510 S.W.3d 655, 661 (Tex. App.—El Paso 2016, no pet.); *Moore*, 269 S.W.3d at 141. Dr. Adams met the first requirement under Section 74.401.

Second, a doctor who is "board certified or has other substantial training or experience," and was "actively practicing medicine" in the area related to the claim has sufficient knowledge of accepted standards of medical care for diagnoses, care, or treatment of the illness, injury, or condition involved in the claim. Tex. Civ. Prac. & Rem. Code § 74.401(a), (c); *Moore*, 269 S.W.3d at 141.

Here, Dr. Adams's report and attached curriculum vitae establish that he has practiced as, and is, a board certified cardiovascular and thoracic surgeon and general trauma surgeon and was certified in surgical critical care with experience dating to 1986. His curriculum vitae demonstrated his extensive experience in these fields of practice until 2007. Since 2007, he has continued to practice surgical critical care based on his past graduate medical training and dual board certifications in subspecialties of surgery. Dr. Adams had sufficient knowledge and experience to render an opinion on the accepted standards of medical care in this case. *Hamon*, 2025 WL 1403684, at *8; *Moore*, 269 S.W.3d at 141–42.

8

Third, to determine whether a witness is qualified as an expert witness on the basis of training and experience, we consider whether the witness is (1) certified by a state licensing agency or national professional certifying agency or has other substantial training or experience in the area of healthcare relevant to the claim and (2) actively practicing healthcare in rendering healthcare services relevant to the claim. *See* Tex. Civ. Prac. & Rem. Code § 74.402(c). An expert's qualifications must appear in the report or in the expert's curriculum vitae; these qualifications cannot be inferred. *Jacksboro Nursing Operations, LLC v. Norman*, No. 02-20-00262-CV, 2021 WL 1421431, at *4 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.). "Although not every licensed doctor is qualified to testify on every medical question, we must be careful not to draw expert qualifications too narrowly." *Adeyemi v. Guerrero*, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.). "The critical inquiry is 'whether the expert's expertise goes to the very matter on which he or she is to give an opinion.'" *Justin I Enters., LLC v. Gierczak*, No. 02-24-00363-CV, 2025 WL 285335, at *4 (Tex. App.—Fort Worth Jan. 23, 2025, pet. denied) (mem. op.) (quoting *Tex. Children's Hosp. v. Knight*, 604 S.W.3d 162, 171 (Tex. App.—Houston [14th Dist.] 2020, pets.denied)). The Texas Supreme Court has rejected the notion that, for example, "only a neurosurgeon can testify about the cause-in-fact of death from an injury to the brain, or even that . . . an emergency room physician could never so testify." *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (citing *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)).

As described above, Dr. Adams is a board certified cardiovascular and thoracic surgeon and general trauma surgeon treating postoperative surgical patients, the same type of circumstances that Seimet presented. Although Dr. Adams is not a "hospitalist," the record reflects that he had experience and expertise regarding the causes and effects of surgical injuries and in post-operative care. *See id.* at 122; *Sagora Senior Living, Inc. v. Wood*, No. 02-25-00150-CV, 2025 WL 2627032, at *5 (Tex. App.—Fort Worth Sept. 11, 2025, no pet.) (mem. op.); *Hamon,* 2025 WL 1403684, at *8. Dr. Adams was qualified to render an expert opinion on the standard of care.

Therefore, the trial court did not abuse its discretion in impliedly finding that Dr. Adams was qualified to issue the expert report in this case and to opine on standards of care for both Appellants. *See* Tex. Civ. Prac. & Rem. Code §§ 74.403, 74.401(a); *see also Hamon*, 2025 WL 1403684, at *8.

### 2. The report adequately addressed the standard of care.

In their first issue, Appellants argue that the report insufficiently identifies the standard of care required for Mekala and fails to sufficiently differentiate the standards of care required of Mekala and Rath. We disagree.

To adequately identify the standard of care, an expert report must set forth "specific information about what the defendant should have done differently." *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880). "While the [A]ct requires only a 'fair summary' of the standard of care and how it was breached, 'even a fair summary must set out what care was expected[ ] but not given.'" *Id.* (quoting *Palacios*, 46 S.W.3d

10

at 880). Ergo, the expert report must explain what the healthcare provider should have done under the circumstances and what he did instead. *Mitchell v. Swanson*, No. 02-19-00460-CV, 2020 WL 6065986, at \*2 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (citing *Palacios*, 46 S.W.3d at 880).

Dr. Adams's report states that Seimet was "a 57-year-old female with multiple comorbidities and an extensive prior surgical history." The report lists her comorbidities as "obesity, obstructive sleep apnea [ ], diabetes mellitus type II, and a diagnosis of endometrial cancer." Seimet had, three years before, undergone an attempted robotic abdominal hysterectomy which resulted in a "iatrogenic through and through perforation of the transverse colon." The perforation went undiagnosed at the time of the surgery, and Seimet was discharged. She then returned and required emergency exploratory laparotomy and partial colectomy with end-colostomy and a follow up surgery shortly thereafter. As a result of the "multiple abdominal surgical procedures, sepsis, multiple subcutaneous wound infections, and poor wound healing," Seimet developed a large ventral hernia.

Before the last surgery, Rath diagnosed Seimet with "a massive ventral hernia . . . with intra-abdominal components inside their hernia sac." Based upon his notes, the report listed her "clinical complaints of intermittent constipation, nausea and vomiting, and pain 8/10 on most days." Rath noted Seimet's comorbidities and recommended admission for open repair and utilization of surgical mesh.

Rath performed open incarcerated ventral hernia repair, anterior component separation, and implantation of surgical mesh. Rath reported no intraoperative complications, and Seimet was admitted for postoperative observation under Mekala's care. Seimet's records show that she was slow to regain bowel function and had poor glucose control despite being on an insulin sliding scale. Rath delegated postoperative care to Mekala and, per Mekala's notes, the two spoke "a couple times during hospital course, including" on the day of release. Mekala released Seimet after three days with instructions to follow up with Rath for post-operative care to remove the surgical drains and change the vacuum-assisted wound-closure device that had been placed at the time of the operation. Dr. Adams's report states that Seimet's records show that she was obviously deconditioned and not a candidate for discharge.

Regarding the standard of care for Mekala, Dr. Adams's report states that "[a] lack of return of bowel function may, and most likely was in this case, a sign of a postoperative ileus, which increases the risk of DVT [deep vein thrombosis]." He opines that "it was inappropriate to discharge her on the third [] post-operative day without addressing the needs of continued anticoagulation to prevent pulmonary embolism, better glucose control, and restoration of gastrointestinal integrity." Seimet evinced symptoms that indicated a known, increased danger of pulmonary embolism while under medical care. *See Staats*, 2025 WL 3301061, at *3–4.

Per Dr. Adams's report, because Mekala was listed in Seimet's medical records as the attending physician, he had a responsibility to ensure that she was sufficiently

12

recovered before discharge was appropriate. Dr. Adams opines that Mekala failed to conform with the accepted standard of care by not providing acceptable postoperative care to Seimet with regard to her deconditioning, glucose management, and prevention of DVT, by her premature discharge. The report adequately addressed the standard of care for Mekala. *See id.* at *3.

Regarding the standard of care for Rath, Dr. Adams's report states that Seimet was prematurely discharged by both Rath and Mekala, effectively applying the same standard of care to both. Appellants argue on appeal that this rendered the report deficient because it failed to "distinguish standards [of care] for the two specialists." However, "[g]rouping different types of healthcare providers together in discussing relevant standards of care does not render an expert report inadequate when the healthcare providers owed the same duties to the plaintiff." *Norberg v. Ameel*, No. 13-18-00165-CV, 2019 WL 6906559, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 19, 2019, pet. denied) (mem. op.); *see Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 648 (Tex. App.—Houston [14th Dist.] 2019 no pet.). Because Dr. Adams's report adequately addressed the standard of care for Mekala and states that the same standard of care applied to both Mekala and Rath, it adequately addressed the standard of care for Rath. *See Staats*, 2025 WL 3301061, at *3–4 (discussing *Bush*, 714 S.W.3d at 546).

### 3. The report adequately addressed causation.

Appellants' second issue challenges whether Dr. Adams' report sufficiently set out the "how and why" of alleged causation for either Rath or Mekala and whether the mechanism of Seimet's death alleged in the report failed to refer to any "symptom or finding [in] the record." We believe Dr. Adams's report was sufficient to explain causation under the "lenient" "low threshold" standard set forth in *Bush*. *See Staats*, 2025 WL 3301061, at *3 (citing *Bush*, 714 S.W.3d at 545–46).

To adequately address the element of causation, an expert must explain how and why the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224. The report need not use the words "proximate cause," "foreseeability," or "cause in fact" because a report's adequacy does not depend on whether the expert uses any particular "magic words." *Zamarripa*, 526 S.W.3d at 460. But the expert report must make a good-faith effort to explain, factually, the two components of proximate cause: (1) foreseeability and (2) cause-in-fact. *Id.* For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission, the harm would not have occurred. *Id.* It is sufficient for the report to draw a direct line from the alleged negligent conduct to a delay in diagnosis and proper treatment, to the ultimate injury. *Staats*, 2025 WL 3301061, at *2 (citing *Abshire*, 563 S.W.3d at 225).

We believe the analysis in *Bush*, a case in which a patient died from a pulmonary embolism after being discharged from the hospital, is apt in this case as well. *See*

14

714 S.W.3d at 540. The plaintiff's embolism in that case went undiagnosed by her physicians at the hospital prior to her discharge. *Id.* Regarding the cause-in-fact prong of proximate cause of the hospital's alleged negligence, the plaintiff's expert against the hospital stated in his amended report that

> as a result of the Hospital's failure to implement the described policies, such as a Triple Rule Out protocol, "a proper workup was never completed[,] which resulted in a lack of appropriate communication between interdisciplinary providers." Had such a workup been completed, and "had it been recognized that [Williams-Bush] was experiencing a bilateral pulmonary embolism, she would have been evaluated by a cardiac or vascular surgeon and would have immediately been anticoagulated, possibl[y] thrombolized and admitted for observation." [Emphasis added.] The report opines that, as a direct result of these failures, Williams-Bush suffered from a "pulmonary embolism that remained undetected and untreated, directly leading to her sudden and untimely death."

*Id.* at 545.

Regarding the foreseeability prong of proximate cause, the plaintiff's expert's report against the hospital stated that the decedent presented with classic symptoms of pulmonary embolism, a life-threatening condition. *Id.* at 545–46. The report stated that the hospital should have implemented policies designed to detect such a condition and that could, upon detection, have resulted in life-saving treatment for the patient. *Id.* at 546. According to the court, the report opined

> that the Hospital's failure to adopt certain policies, such as a standing order to run the Triple Rule Out protocol for patients presenting certain symptoms, caused a misdiagnosis, which caused Williams-Bush to die from a pulmonary embolism.

*Id.* The supreme court held that the report was sufficient. *Id.*

15

Similarly, we believe the facts and analysis in a recent case in this court, *Staats*, are instructive. *See* 2025 WL 3301061, at *4. In that case, the expert reports[6] stated that infection leading to liver abscesses occurring secondary to dental procedures are a well-recognized risk of the surgery that was performed on the patient. *Id.* at *4. The expert reports stated that, in reasonable medical probability, had the patient's fevers that began immediately after surgery—a sign of infection—been recognized and treated with antibiotics and proper post-operative follow-up care, the infection would not have developed into a liver abscess. *Id.* We held that the expert report sufficiently explained causation under the threshold established by *Bush. Id.* These analyses will control our analysis of the report in this case.

Regarding the alleged breach of duty by Mekala, the report states that most patients develop a pulmonary embolism when they start to ambulate and that it starts from an unrecognized source, that is, DVT or pelvic thrombosis. Dr. Adams's opinion is that, in all reasonable medical probability, Seimet suffered an avoidable and treatable pulmonary embolism while at home due to her premature discharge from the hospital, which caused her death. This occurred because, at the time of her discharge from the hospital, she was not beyond the window of developing a pulmonary embolism or DVT and had not met the appropriate standards for discharge. The report opines that, had

---

[6]The plaintiff in *Staats* filed two expert reports, which the court considered together. *Id.* at *3.

16

she not been prematurely discharged, she would have been under the supervision of trained doctors and medical staff in the hospital who could have instituted preventative measures such as regular monitoring for signs of DVT and could have prescribed anticoagulants if signs appeared. The report concludes that the postsurgical care provided to Seimet by Mekala breached the accepted standards of care and caused Seimet's death because, had she not been prematurely released, "her DVT would have been prevented or recognized early enough to be treated, and she would in all reasonable medical probability be alive today."

We believe that, under the standard dictated by *Bush*, the report appropriately states the standard required of Mekala—postsurgical monitoring for "obvious" precursors of DVT and pulmonary embolism until the patient is sufficiently recovered—and his alleged breach of that standard of care and causation—premature discharge resulting in preventable death. *See Bush*, 714 S.W.3d at 549; *Staats*, 2025 WL 3301061, at *3–4.

Regarding Rath, the report states that he delegated post-operative care to Mekala but that Mekala and Rath communicated "a couple [of] times" about her care. The report states that Rath was inattentive to Seimet's post-operative care and that he failed to appropriately manage the expected potential complications associated with the surgery he had performed. The report assesses that Seimet's early release by both Rath and Mekala caused Seimet's harm and that Rath was inattentive to the postoperative care and failed to appropriately manage the expected potential complications of the

17

surgery he performed. The report sufficiently articulated breach and causation as to Rath. *Harvey*, 578 S.W.3d at 648–49.

Appellants further argue that the record does not reflect symptoms that Dr. Adams's report states would dictate the care required, and does not support Dr. Adams's contention that Seimet's death was caused by a pulmonary embolism. However, these arguments are premature. *See Staats*, 2025 WL 3301061, at *2. Whether Dr. Adams's standard-of-care opinion is correct is not the question at this stage in the litigation. *See In re Stacy K. Boone, P.A.*, 223 S.W.3d 398, 406 (Tex. App.—Amarillo 2006, orig. proceeding) ("While [defendants] may disagree with [the expert's] opinions concerning the standard of care applicable to each of th[e] individual defendants, the report contains a fair summary of his opinions and adequately informs them of the specific conduct called into question."). The same is true of the correctness of the theories of causation in the report. *See Staats*, 2025 WL 3301061, at *4 (holding that corrected reports, considered together, supported at least one theory of liability and so were sufficient under the Act); *Keepers v. Smith*, No. 01-20-00463-CV, 2022 WL 2347744, at *16 (Tex. App.—Houston [1st Dist.] June 30, 2022, pet. denied) (mem. op.) (holding that an expert report need not marshal all the plaintiff's proof necessary to establish causation at trial, and it need not anticipate all possible defensive theories that may ultimately be presented to the trial court); *Walker v. Srivastava*, No. 14-19-00270-CV, 2020 WL 4092103, at *5 (Tex. App.—Houston [14th Dist.] July 21, 2020, no pet.) (mem. op.) (quoting *Abshire*, 563 S.W.3d at 226) (holding that argument about

correctness of what is required under the standard of care "is a matter to be determined at summary judgment and beyond"); *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting expert's conclusion that standard of care and breach were same for both defendant physicians may be incorrect, but correctness is a merits question, not one for a motion to dismiss under the Act). Appellants' argument that Dr. Adams's report finds insufficient record support also fails.

### 4. The amended report was sufficient.

Because the report was sufficient, the trial court did not abuse its discretion by denying Appellants' motion to dismiss. *See Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Garcia v. Allen*, 337 S.W.3d 366, 373 (Tex. App.—Fort Worth 2011, no pet.); *Maris v. Hendricks*, 262 S.W.3d 379, 383 (Tex. App.—Fort Worth 2008, pet. denied). We overrule Appellants' first three issues challenging the sufficiency of the report.

Appellants argued in their fourth issue that "the Second Report is the second report, intended to correct deficiencies in the earlier report. It corrected none of them." An expert report that a trial court finds deficient may be cured by timely amendment or supplementation. *See* Tex. Civ. Prac. & Rem. Code § 74.351(c). The statute lays out no special requirements for an amended or supplemental report beyond those of sufficiency for any report under the Act. *See id.* When an expert report has been supplemented, a court considers both the original expert report and the supplemental expert report when reviewing the adequacy. *See Kuhn v. Sam*, No. 01-20-00260-CV,

2021 WL 3359171, at *7 (Tex. App.—Houston [1st Dist.] Aug. 3, 2021, no pet.) (mem. op.); *Scherer v. Gandy*, No. 07-18-00341-CV, 2019 WL 988174, at *2 n.4 (Tex. App.—Amarillo Feb. 28, 2019, no pet.) (mem. op.). Multiple expert reports, when read together, are held to the same standard as the original report. Because the report was sufficient as amended, we overrule Appellants' fourth issue.

## III.   CONCLUSION

Having overruled each of Appellants' issues, we affirm the trial court's order denying Appellants' second motion to dismiss and remand the case to the trial court for further proceedings.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: August 6, 2026